# Supreme Court of Florida

---

No. SC2023-1586

---

## IN RE: CERTIFICATION OF NEED FOR ADDITIONAL JUDGES.

November 30, 2023

PER CURIAM.

This opinion addresses the need to increase or decrease the number of judges in fiscal year 2024-25 and certifies our "findings and recommendations concerning such need" to the Florida Legislature.[1] Certification is "the sole mechanism established by

---

1. Article V, section 9 of the Florida Constitution provides in pertinent part:

> **Determination of number of judges.—**The supreme court shall establish by rule uniform criteria for the determination of the need for additional judges except supreme court justices, the necessity for decreasing the number of judges and for increasing, decreasing or redefining appellate districts and judicial circuits. If the supreme court finds that a need exists for increasing or decreasing the number of judges or increasing, decreasing or redefining appellate districts and judicial circuits, it shall, prior to the next regular session of the

our constitution for a systematic and uniform assessment of this need." *In re Certification of Need for Additional Judges*, 889 So. 2d 734, 735 (Fla. 2004). A separate opinion, to be released on a future date, will address the Court's findings as to whether there is a need to decrease the number of judicial circuits.[2]

In this opinion, we certify the need for one additional circuit court judgeship (in the Twentieth Judicial Circuit) and five additional county court judgeships (three in Orange County and two in Hillsborough County). We certify no need for additional district court of appeal judgeships. We certify the need to decrease two county court judgeships (one each in Alachua and Brevard Counties) and certify that there is no need to decrease the number of circuit court judgeships. Although we certify there is no need to decrease the number of district court of appeal judgeships, we

legislature, certify to the legislature its findings and recommendations concerning such need.

2. See *In re Judicial Circuit Assessment Committee*, Florida Administrative Order No. AOSC23-35 (June 30, 2023), which establishes a committee to study whether consolidation of the state's existing judicial circuits is warranted. The committee's findings and recommendations are due to the chief justice by December 1, 2023.

acknowledge excess judicial capacity in the First District Court of Appeal and the Second District Court of Appeal. As we explain, the Court recommends that the Legislature address this excess appellate judicial capacity over time by reducing the number of statutorily authorized judgeships based on attrition, without requiring a judge to vacate his or her position involuntarily.

## Trial Courts

The Court continues to use a verified objective weighted caseload methodology as a primary basis for assessing judicial need for the trial courts.[3] The case weighting system distinguishes the types of cases and addresses the differences in the amount of time that must be spent on cases of each type, producing a total judicial need for each circuit. Additionally, the methodology includes adjustments for differing jury trial rates, chief judge responsibilities, and canvassing boards in each circuit and county. The trial courts also submit judgeship needs applications that supplement the objective weighted caseload data, including descriptions of how

---

3. Our certification methodology relies primarily on case weights and calculations of available judge time to determine the need for additional trial court judges. *See* Fla. R. Gen. Prac. & Jud. Admin. 2.240.

secondary factors[4] are affecting those courts. The secondary factors identified by each chief judge reflect local differences in support of their requests for more judgeships or in support of their requests for this Court not to certify the need to decrease judgeships in situations in which the objective case weights alone would indicate excess judicial capacity.

For more than two decades, Florida's trial courts have used a weighted caseload method to determine the need for judges in each of their circuit and county courts. The original recommendations of the 2000 *Florida Delphi-Based Weighted Caseload Project: Final Report*, and the subsequently modified Florida Rule of General Practice and Judicial Administration 2.240, call for the weighted caseload method to be updated every five years. Recommendations from the last formal judicial workload assessment were published in May 2016. Given the impacts of the Coronavirus Disease 2019

---

4. Other factors that may be utilized in the determination of judicial need are prescribed in Florida Rule of General Practice and Judicial Administration 2.240.

pandemic and recent jurisdictional threshold changes[5] within the trial courts, that cyclical review was necessarily delayed. It is important for any new trial court case weights developed to be valid and reliable and have a "shelf-life" to substantiate determinations of judicial need until the next formal methodology review. The Court is mindful that we are now seven years removed from updating the case weights used to evaluate trial court judicial workload. The Court has determined it appropriate to take a cautious approach to certifying the need to decrease judgeships until the new weights become available in summer 2024.

In early 2023, the Office of the State Courts Administrator began the process of updating all trial court case weights. This is a statewide effort involving all circuit court judges, county court judges, senior judges, magistrates, child support enforcement hearing officers, and civil traffic infraction hearing officers. Total annual workload is calculated by multiplying the annual filings for each case type by the corresponding case weight, then summing the

---

5. Under chapter 2019-58, section 9, Laws of Florida, county court monetary jurisdiction increased to an upper limit of $30,000 on January 1, 2020, and increased to $50,000 on January 1, 2023.

workload across all case types.  Each court's workload is then

divided by a judge year value to determine the total number of full-

time equivalent judges needed to handle the workload.  This

workload assessment is comprehensive and will be carefully

validated.  As with previous workload studies, the Legislature is

apprised through communication of study status to the Office of

Program Policy Analysis and Government Accountability.  Oversight

of this initiative is being conducted by a Judicial Needs Assessment

Committee and the Commission on Trial Court Performance and

Accountability.[6]  As with previous studies, we have contracted with

the National Center for State Courts[7] to conduct the study with

assistance from the Office of the State Courts Administrator.  The

---

6. *In re Commission on Trial Court Performance and Accountability*, Fla. Admin. Order No. AOSC22-36 (July 28, 2022).

7. Staff of the National Center for State Courts are subject matter experts in evaluating judicial workload and have conducted similar workload studies in more than 30 states throughout the country.  *See Workload assessment*, Nat'l Ctr. for State Cts., http://www.ncsc.org/workload-assessment (last visited November 20, 2023).

study formally began in January 2023 and is expected to conclude by June 2024.

Based on the analysis under the weighted caseload methodology, and using the existing case weights pending completion of the updated study, we conclude that there is a demonstrable need for an additional circuit court judge in the Twentieth Judicial Circuit. Additionally, under this same methodology, we conclude there is a demonstrable need for three additional county court judges for Orange County and two additional county court judges for Hillsborough County.[8] The two-step analysis and consideration of other factors suggested the need to decrease circuit court judgeships in the Eleventh Judicial Circuit and the need to decrease county court judgeships in Alachua County and Brevard County. However, the Court determines that other relevant circumstances further explained below, coupled with the secondary-factor analysis, militate against certifying the need to

---

8. Applying the weighted caseload methodology, Walton County would appear to be eligible for an additional county court judgeship. However, if the Court were to certify the need for that judgeship, the county would immediately fall below the workload threshold suggesting the need to decrease that same judgeship.

decrease all but two of those county court judgeships, one judgeship in Alachua County and one judgeship in Brevard County. We base this recommendation on a demonstrated, multi-year trend of excess judicial capacity in those two counties.

The judicial needs applications submitted by the chief judges noted some limitations of the existing case weights to capture a complete picture of case complexity addressed by trial court judges. Since the last case weight update in 2016, state laws have changed significantly, affecting the courts' work in interpreting and applying those laws. Court operations have also changed significantly as a result of the pandemic. Further, trial court jurisdictional thresholds[9] have changed, affecting workload in the circuit and county courts.

The Court also considered other significant factors, including the anticipated cases resulting from recent hurricanes that have affected the state and judicial time related to the implementation of civil case management requirements.[10] These factors contributed to

---

9. *See supra* note 5.

10. See *In re COVID-19 Health and Safety Protocols and Emergency Operational Measures for Florida Appellate and Trial*

the Court's cautious approach to certifying the need to decrease trial court judgeships.

## District Courts of Appeal

In furtherance of our constitutional obligation to determine the State's need for additional judges in fiscal year 2024-25,[11] this opinion certifies the need for no additional district court judgeships.

At our direction,[12] and pursuant to rule 2.240, the Commission on District Court of Appeal Performance and Accountability reviewed the workload trends of the district courts of appeal and considered adjustments in the relative case weights. As in other district court workload assessments, the Commission conducted a review of the existing case types, identified the median case by which all other cases would be measured, and administered

*Courts*, Florida Administrative Order No. AOSC21-17, Amendment 3 (Jan. 8, 2022), which requires presiding judges to actively manage civil cases, including issuing case management orders that address deadlines for serving complaints and extensions, adding new parties, completing discovery, resolving objections to pleadings, and resolving pretrial motions.

11. *See supra* note 1.

12. *See In re Commission on District Court of Appeal Performance and Accountability*, Fla. Admin. Order No. AOSC20-55 (June 24, 2020).

a survey to district court judges to gather data on the workload associated with disposing cases by type. Case weights were then developed and applied to each court's dispositions on the merits to determine the weighted caseload value. The weighted caseload model is a more accurate representation of judicial workload in that it addresses differences in the amount of judicial time that must be spent on each type of case. The Court approved the updated weights in June 2023, and this certification opinion is based on those new case weights.

The Court also recently directed[13] the Commission on District Court of Appeal Performance and Accountability to examine the factors used to determine the need to certify increasing or decreasing the number of judges on a district court, the language regarding a presumption of need for an additional judgeship, and a means for evaluating if a district court has surplus judicial capacity. Given this ongoing review, the recent adjustment in district court case weights, and the excess district court of appeal

_____

13. *See In re Commission on District Court of Appeal Performance and Accountability*, Fla. Admin. Order No. AOSC22-24 (July 12, 2022).

capacity discussed below, the Court determined it would not be appropriate to certify the need for additional district court judgeships at this time.

As addressed in previous certifications of need for additional judges,[14] the Court recognizes excess judicial capacity in the First District and the Second District based on the addition of a sixth district, corresponding jurisdictional boundary changes in three existing districts, and the policy decision not to require judges to relocate. However, the Court continues to recommend that this excess capacity be addressed over time through attrition and therefore is not certifying the need to decrease any district court judgeships.

Based on a current workload analysis,[15] and as was noted in last year's judicial certification opinion, we have determined that

14. *See In re Redefinition of App. Dists. & Certif. of Need for Addt'l App. Judges*, 345 So. 3d 703, 706 (Fla. 2021); *In re Certif. of Need for Addt'l Judges*, 353 So. 3d 565, 568 (Fla. 2022).

15. Cases disposed on the merits by the district courts of appeal were historically realigned, based on the current six district boundary lines, for the purpose of the workload calculations. Six months of actual data were available for use for the new Sixth District Court of Appeal, and that data was combined with the

there is estimated excess judicial capacity in the First District and Second District. To address this situation, this Court recommends that during the 2024 Regular Session the Legislature consider enacting legislation that provides for reduction in the number of statutorily authorized district court judgeships based on attrition and without requiring a judge to vacate his or her position involuntarily. Such legislation could specify that, upon each occurrence of an event that otherwise would have resulted in a vacancy in the office of judge of the First District or Second District, the number of authorized judges shall be reduced by one, until a specified number of judges remain on each court. We recommend that eventually, after attrition, there be 12 judges authorized for each of those courts.[16] The goal of the Court's recommended approach, consistent with last year's opinion, is to address excess district court judicial capacity without prematurely ending an existing judge's judicial career.

historical re-creation of that district court's caseload for purposes of analysis.

16. *See* Fla. SB 490 (2024) (proposed amendment to § 35.06, Fla. Stat.); Fla. HB 457 (2024) (same).

The Court continues to use a verified objective weighted caseload methodology as a primary basis for assessing judicial need in the district courts of appeal,[17] as well as considering qualitative factors and other factors analogous to those it considers in assessing trial court workload. Based on that analysis, the Court does not certify the need to increase or decrease judgeships in the district courts of appeal at this time. As the Court noted in its previous certification opinions, it will take some time to fully assess the effect of the jurisdictional boundary changes on workload and judicial need for any given district court and statewide.

## Conclusion

We have conducted a quantitative and a qualitative assessment of trial court and appellate court judicial workload. Using the case-weighted methodology and the application of other factors identified in Florida Rule of General Practice and Judicial Administration 2.240, we certify the need for one additional circuit court judgeship in the Twentieth Judicial Circuit, three additional

---

17. Our certification methodology relies primarily on the relative weight of cases disposed on the merits to determine the need for additional district court judges. *See* Fla. R. Gen. Prac. & Jud. Admin. 2.240.

county court judges for Orange County, and two additional county court judges for Hillsborough County. We recommend no decrease in circuit court judgeships, a decrease of one county court judgeship in Alachua County, and a decrease of one county court judgeship in Brevard County. We certify no need for additional judgeships in the district courts of appeal. Finally, we recommend legislation to reduce the number of statutorily authorized judgeships in the First District and the Second District based on attrition and without requiring a judge to vacate his or her position involuntarily, as noted in this certification.

It is so ordered.

MUÑIZ, C.J., and CANADY, COURIEL, and FRANCIS, JJ., concur.
LABARGA, J., concurs in part and dissents in part with an opinion.
SASSO, J., concurs in part and dissents in part with an opinion, in which GROSSHANS, J., concurs.

LABARGA, J., concurring in part and dissenting in part.

For the reasons expressed in Justice Sasso's concurring in part and dissenting in part opinion, I dissent from the majority's opinion to the extent it decertifies judgeships in Alachua and Brevard counties.

However, I concur with the majority in all other respects, including its decision to decline to certify the need for an additional judge in the Sixth District Court of Appeal.

SASSO, J., concurring in part and dissenting in part.

I agree with the majority's decision to certify the need for additional judgeships in the Twentieth Judicial Circuit and in Orange and Hillsborough Counties. For the reasons I will explain though, I disagree with both the decision to certify a decreased need in Alachua and Brevard Counties and the decision not to certify the need for an additional judgeship in the Sixth District.

**Trial Courts**

Florida Rule of General Practice and Judicial Administration 2.240 guides our determination of the need for additional judges and provides that we may consider two categories of data. The first and primary category is the quantitative data, based chiefly upon a workload measurement derived from the application of case weights to circuit and county court caseload statistics. *See* Fla. R. Gen. Prac. & Jud. Admin. 2.240(b)(1)(A). The second is the qualitative data, which includes several factors that, while more difficult to quantify, help fully measure judicial workload. *See* Fla. R. Gen.

Prac. & Jud. Admin. 2.240(b)(1)(B), (c). To assess the qualitative factors, we largely rely on the annual reports and requests provided by the chief judge of each circuit.

This year, there is a considerable disconnect between the determination that flows from application of the quantitative measurement (the weighted caseload methodology) and the determination that flows from consideration of the chief judges' reports and requests. For example, the weighted caseload methodology results in the determination that only one circuit, the Twentieth Circuit, has the need for an additional circuit judge. But eleven out of the state's twenty circuits have requested at least one additional circuit judge, with some circuits requesting up to four additional judges. Similarly, the weighted caseload methodology results in the conclusion that eighteen county courts should have judicial positions decertified. But the chief judges do not agree, citing inter alia population growth, the increased request for interpreters, the number of county court judges performing circuit court work, and the substantial resources county court judges commit to community endeavors.

The cause for the disconnect is somewhat speculative, but there are a few things we know for sure. As the majority notes, the metrics underlying the weighted caseload methodology have not been evaluated since 2016, despite our determination that they should be reevaluated every five years. And as the majority notes, there is a good and valid explanation for that delay, but the fact remains that it has not been done. We also know that Florida's court system has undergone considerable changes since 2016, including subject matter jurisdiction changes, a reconfiguration of the district courts, and lasting operational modifications resulting from the global pandemic.

Given the clear disconnect between the quantitative and qualitative data, and what is likely an outdated mode of producing quantitative results, I agree with the majority's cautious approach. However, in my view, it is not cautious enough. Until we have the benefit of a refined weighted caseload methodology, I believe we should maintain the status quo except where the formula results in a recommendation for additional judgeships. This approach better reflects the reports from the chief judges, which I find more persuasive than the results produced by applying the case weight

methodology. For that reason, I respectfully dissent from the majority's opinion to the extent that it certifies a decreased need for judgeships in Brevard and Alachua Counties.

**District Courts**

Only one district court, the newly created Sixth District, has requested an additional judge. This request would bring the number of judges serving the Sixth District to ten, which is the number of judges that this Court initially determined would accurately reflect the needs of the district. *See In re Redefinition of App. Dists. & Certif. of Need for Addt'l App. Judg*es, 345 So. 3d 703, 706 (Fla. 2021). And while the Sixth District only has about a year of experience on which it can draw, the judges of that district have provided a thoughtful analysis outlining the inherent limitations of the current methodology's ability to produce an accurate picture of the Sixth District's needs. To fill the gap, the Sixth District draws on existing data to provide a more representative view of the district's current and future needs. In doing so, the Sixth District makes a strong case for why this Court's initial assessment was correct. For that reason, I would certify the need for an additional

- 18 -

judge in the Sixth District, and I respectfully dissent from the portion of the majority's opinion declining to do so.

GROSSHANS, J., concurs.

Original Proceeding – Certification of Need for Additional Judges